UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RICARDO HARO,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>RODNEY BRYANT, et al.,<br><br>　　　　Defendants. | CIVIL ACTION NO.<br>1:21-CV-04478-JPB |

## ORDER

This matter is before the Court on Rodney Bryant and the City of Atlanta's Motion for Summary Judgment [Doc. 57].  This Court finds as follows:

## BACKGROUND

This action arises from Ricardo Haro's ("Plaintiff" or "Haro") arrest after attending demonstrations and protests in downtown Atlanta, and the subsequent press conference and press release branding Haro as a violent criminal.  [Doc. 1]. Plaintiff brings this action against the City of Atlanta and the Atlanta Police Department ("APD") Chief of Police, Rodney Bryant ("Defendants").  This case does not center on whether Defendants violated Haro's rights at the time of his arrest—rather, Haro's claims are focused on the subsequent public statements about Haro.  In short, the Complaint alleges that Defendants retaliated against Haro

for exercising his First Amendment rights by making defamatory statements about him to the public.  Id.

On October 23, 2023, following the close of discovery, Defendants moved for summary judgment.  [Doc. 57].  The Motion for Summary Judgment is now ripe for the Court's review.

## STATEMENT OF FACTS

The Court derives the facts of this case from the parties' statements of undisputed material facts and their responses thereto.  The Court also conducted its own review of the record.  The facts of this case, for purposes of adjudicating the instant motion for summary judgment, are as follows:

### I.     Haro's Arrest

On June 4, 2020, Haro attended demonstrations and protests in downtown Atlanta.  [Doc. 71, pp. 1–2].  At approximately 9:30 that evening, APD officers responded to a suspicious person call.  [Doc. 67, p. 6].  Upon arrival, the officers encountered Haro, who was on the roof of his car.  Id. at 7.  APD arrested Haro for violating the city curfew that was in place at the time.  [Doc. 71, p. 2].  While Haro was in custody, he made several statements to the officers including referring to himself as Jesus, telling the officers they were going to hell, using profanities and threatening the officers by saying he was going to "chop" them up "like f***ing

onions." [Doc. 67, p. 8]. At one point, Haro spat blood on an FBI agent and as a result he was charged with simple battery on a police officer.[1]  Id. at 8–9. Approximately five minutes after the spitting incident, during Haro's processing, an FBI agent stated, "You get his s**t, we're gonna send it to the uh, U.S. Attorney in August." [Doc. 71, p. 3].

## II. Operation Phoenix

After the resignation of the former APD Police Chief, Defendant Bryant came out of retirement to serve as Interim Police Chief, effective June 12, 2020. [Doc. 67, p. 10]. At the time that Bryant began serving as Police Chief, the city faced significant issues with the ongoing COVID-19 pandemic, court closures, social unrest and an increase in violent crimes. Id.  Bryant sought help from the federal government to address these issues and, as a result, the federal government formalized "Operation Phoenix" on August 18, 2020. Id. at 12.

Operation Phoenix was a multi-agency operation formed to identify, investigate and prosecute violent individuals to charge and prosecute through the federal justice system. Id. The agencies that participated in Operation Phoenix were the FBI, Safe Streets Gang Task Force, APD, United States Attorney's Office

---

[1] It is undisputed that Haro spat on the agent, however, it is disputed whether it was intentional. [Doc. 71, p. 3].

for the Northern District of Georgia ("USAO"), Georgia Bureau of Investigation, Homeland Security Investigations, Bureau of Alcohol, Tobacco, Firearms and Explosives, Drug Enforcement Administration and United States Secret Service. Id. at 13.

### III. Efforts to Federally Charge Haro

On the ground, Operation Phoenix was divided into eight teams consisting of representatives from the various participating organizations. Id. at 13. The teams processed information on criminals and suspected criminals and forwarded the information to the FBI and USAO for prosecutorial decision-making. Id. at 14. Information on Haro was passed up the chain from Team 4, which consisted of two FBI special agents, an FBI task force officer, a Secret Service agent and an APD officer. Id.; [Doc. 68-2, p. 4]. The FBI was the sponsoring agency seeking to federally prosecute Haro. [Doc. 67, p. 16].

Defendant Bryant's participation in Operation Phoenix was limited to periodic conference calls and he made no recommendations of individuals for inclusion in the operation. Id. at 17. However, on three occasions in September 2020, the FBI directly provided Bryant three PowerPoint presentations that the parties refer to as "baseball cards." [Doc. 71, p. 4]. The baseball cards were the

4

subject of several meetings between the FBI and APD, and Bryant likely reviewed the baseball cards when he received them.  Id. at 6–7.

The baseball cards provided the gang affiliations and criminal history of eighteen specific targets of Operation Phoenix, including Haro.  Id. at 5; [Doc. 68-2, p. 18].  Haro's baseball card states that he was arrested on June 4, 2020, by APD for simple battery towards a police officer.  [Doc. 68-2, p. 18].  Haro's baseball card further states the following:

> . . . Haro was being processed for transport to the city jail in violation of the 9:00 pm curfew on 4 June 2020, when he spat blood on the right arm of FBI SA Thomas McAfee.  Following the incident, Haro also stated that he had a machete in his car and threatened to kill people with it.

Id.  Haro's baseball card also stated that database queries produced zero results for Haro other than the Assault on a Federal Officer investigation. Id.

### IV.  Press Statements

On October 29, 2020, the FBI, USAO and APD held a press conference about Operation Phoenix.  [Doc. 67, pp. 27–28].  The lead speakers at the press conference were FBI Special Agent in Charge Chris Hacker, former United States Attorney Bjay Pak and Defendant Bryant.  Id. at 28.  Agent Hacker began the press

conference by announcing the launch of Operation Phoenix to address the rise in violent crime in Atlanta. [Doc. 71, p. 14]. Agent Hacker stated:

> In ten short weeks, after we started Operation Phoenix, we identified about a dozen individuals who we believe to be some of the most significant violent offenders in the city. We jointly investigated those individuals, and brought the results to Mr. Pak, whose office brought federal charges against many of these individuals. We believe this initiative will slow the violence and we also believe it should serve as a strong deterrent for … any violent crime activities. The bottom line is there's gonna be consequences for committing violent crime in Atlanta.

Id. Agent Hacker then added that the Operation Phoenix team would continue to work together and identify the most violent criminal offenders and bring those cases to the USAO to seek federal prosecution. Id.

> Next, Bryant spoke at the press conference, stating as follows:
>
> How did we get here? We began to see crime beginning to increase in May of this year, which coincided with the opening of the city as it relates to people suffering from the stresses of COVID 19. And as those numbers began to spike, as we entered upon civil unrest we saw the greatest numbers of homicides in our City. We had more homicides in the month of July than we had had in most previous years.
>
>  . . . So, as [my team] brought me down to give me some ideas of what we were seeing as it relates to violent crime, they showed me a network of individuals that they believed were truly committed to continuing violence and thought that they were having a significant impact on the crime that we were seeing inside the city.
>
> Immediately looking at this work, this vast work that they had delivered to the Command Staff, I recognized that we needed to bring

6

> in partnerships and so immediately I called Chris Hacker over at the FBI who I worked with prior to my retirement and always had a strong partnership with and asked for his assistance. And immediately we developed an idea to broaden the perspective of partnership and we thought that this would really have a significant impact on what we were trying to accomplish.
>
> . . . And so immediately after we developed [Operation Phoenix], the numbers started to stave off as we started to make arrests of some of these individuals. There's no specific area in this City of Atlanta that these individuals did not touch. There was no specific crime other than their violence that they did not touch. There was no level of crime that they did not have an impact on. This included gang affiliation, drug sales, and violent crimes alike.
>
> . . . These individuals were repeat violent offenders. There was some nexus with them and violence, and we deemed them to be responsible for some of the most violent crimes in the City of Atlanta. This included guns, gang affiliations, gun trafficking, and so on.
>
> What we recognize is that these individuals had some type of partnership or nexus to each other, so they may be two different gangs fighting with each other, or hanging out in the same area, but there was always some level of connectivity from one individual to the next. Not necessarily in partnership, but some level, either they got into it with each other, or they were fighting over the same territory, things of that nature . . . [the common denominator] being violence.

Id. at 15–17; [Doc. 67, pp. 30–31].

On the same day as the press conference, the FBI issued a press release, which stated:

> Atlanta – FBI Special Agent in Charge Chris Hacker, Interim Atlanta Police Chief Rodney Bryant and U.S. Attorney Byung J. "BJay" Pak announce that twelve of Atlanta's most violent offenders are being

7

> charged as a result of Operation Phoenix, a sustained and coordinated law enforcement initiative to fight violent crime in the City of Atlanta.
>
> Operation Phoenix began on August 18, 2020 in an effort to identify, investigate and prosecute those individuals deemed the most dangerous to the citizens of this city.  Federal law enforcement agencies worked in conjunction with local and state law enforcement officials to identify offenders.

[Doc. 57-5, p. 2].  The press release listed twelve individuals, one of which was Haro:  "Ricardo Haro, 19, Simple Battery against a Police Officer (state charge)." Id. at 3.

Following the press statements, on February 18, 2021, an APD investigator was exchanging emails with a prosecutor with the subject line "Agent McAffee," the FBI agent that Haro spat on.  [Doc. 71, p. 17].  In the email, the APD investigator asked if the prosecutor "[was] ever able to develop that case against the protester that spit on Agent McAffee."  Id.  Agent McAfee was later added to the email chain and was instructed to call the Fulton County Senior District Attorney about the Haro case.  Id. at 18.  The FBI has not disclosed its deliberations or any purported basis on which Haro was included in Operation Phoenix beyond what is contained in the baseball cards and what was communicated by the FBI to APD.  Id. at 9.

8

## DISCUSSION

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual issue is "'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Ultimately, "[t]he basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Allen, 121 F.3d at 646 (quoting Anderson, 477 U.S. at 251–52).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." Id. After the movant satisfies this initial burden, the nonmovant bears the burden of showing specific facts that indicate summary judgment is improper

because a material issue of fact does exist. Id. However, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting Anderson, 477 U.S. at 252). If the record taken as a whole cannot "lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

### I.  First Amendment Retaliation

The Court will first analyze Haro's First Amendment Retaliation claim against both of the defendants, wherein Haro alleges that Defendants made defamatory public statements about him in retaliation for his participation in city-wide protests criticizing the police.

To prove a First Amendment retaliation claim, a plaintiff generally must show: (1) he engaged in constitutionally protected speech; (2) the defendant's retaliatory conduct adversely affected that protected speech; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech. DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1289 (11th Cir. 2019). Defendants challenge only the third element—causation.

To establish the third prong of the test, "the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." Castle v. Appalachian Tech. Coll., 631 F.3d 1194, 1197 (11th Cir. 2011). Thus, the causation question centers on whether the defendant took the allegedly retaliatory action because the plaintiff engaged in constitutionally protected speech. See Brannon v. Finkelstein, 754 F.3d 1269, 1275 (11th Cir. 2014).

Defendants argue that Plaintiff is unable to establish a causal link between Plaintiff's First Amendment activities and the press statements because there is no evidence that Bryant had any knowledge about Plaintiff's First Amendment activities at the time of the press statements. Defendants also argue that causation is lacking because the FBI issued the press statements, not Bryant. In response, Plaintiff argues that Bryant was subjectively aware of Haro and the circumstances surrounding his arrest through the baseball cards and the meetings he attended leading up to the press statements. Plaintiff also urges the Court to draw an inference of causation based on the evidence showing that Haro's lack of violent criminal history or gang affiliation bared no resemblance to the other individuals identified in the press release and the close temporal proximity between Haro's exercise of free speech and the purported retaliation. Ultimately, Plaintiff asserts

11

that, based on the circumstantial evidence, the decision to include Haro in the press statements cannot be explained except as retaliation.

Before making its findings, the Court notes that the parties have set forth different causation tests to apply to the instant action. Indeed, Plaintiff's response brief makes legal arguments under two different causation tests. The causation test that should be applied to this case is dependent on what type of First Amendment retaliation case is before the Court. DeMartini, 942 F.3d 1289–1300. In DeMartini v. Town of Gulf Stream, the Eleventh Circuit Court of Appeals provides an extensive background about the causation tests it adopts for different types of First Amendment retaliation cases. 942 F.3d 1289–1300. In cases alleging retaliatory employment actions, the appropriate causation test involves a burden shifting analysis: the plaintiff must first establish that his protected activity was a "substantial factor" or a "motivating factor" for the alleged retaliatory action, and if that burden is met, the defendant must then show that he would have taken the same action in absence of the protected activity. Id. at 1290 (quoting Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285–87 (1977)). In cases involving allegations of retaliatory arrest, prosecution or the retaliatory filing of a civil lawsuit, the question becomes whether Plaintiff can show the absence of probable cause. Id. at 1290–98. Nevertheless, this Court need not determine the

specific causation test that applies in this scenario because the record does not support a finding of causation under either test.

While Plaintiff asserts his belief that Defendants included him in the Operation Phoenix press statements in retaliation for his protesting police brutality and the use of excessive force, the record contains insufficient evidence to link Plaintiff's First Amendment activities to the press statements.  It is true that the record shows that Bryant was aware of the circumstances surrounding Haro's arrest from the baseball cards including Haro's curfew violation, Haro's spitting on the FBI agent and Haro's statement about killing people with a machete.  However, the record lacks any evidence showing that Plaintiff's First Amendment activities—specifically his speech in protest of police brutality and the use of excessive force—were the reason for his inclusion in the Operation Phoenix press statements.  Indeed, the record contains no evidence—circumstantial or direct—demonstrating that his protesting activities prior to his arrest, or any anti-law enforcement statements he made during his arrest, were ever considered or discussed in reaching the decision to include him in the press statements.  And while a court must draw reasonable inferences in the nonmovant's favor, the Court cannot reasonably infer, based on the evidence before it, that a causal connection exists between Plaintiff's First Amendment activities and the subsequent press

statements.² Because Plaintiff cannot satisfy the causation element of his First Amendment retaliation claim, Defendants are entitled to summary judgment. Thus, to the extent that Defendants seek summary judgment as to the retaliation claim, the Motion is **GRANTED**.

## II. Defamation

The Court next addresses Plaintiff's defamation claim against Defendant Bryant, which is before the Court pursuant to the Court's supplemental jurisdiction. 28 U.S.C. § 1367 "empowers [a] trial court to decline to exercise supplemental jurisdiction over a state law claim if it has dismissed all of the related claims over which it has jurisdiction." Engelhardt v. Paul Revere Life Ins. Co., 139 F.3d 1346, 1350 (11th Cir. 1998). In assessing whether to retain or reject supplemental jurisdiction, a court should consider the following factors: judicial economy, convenience, fairness and comity. West v. City of Albany, 830 F. App'x 588, 597 (11th Cir. 2020). Notably, the Eleventh Circuit has stated that in the

---

² Notwithstanding this finding, the Court notes that the record likely contains sufficient evidence to raise a material dispute as to whether Haro's inclusion in the press statements was causally linked to his spitting on the FBI agent. Indeed, the record shows that minutes after the spitting incident, an FBI agent stated he would send Haro's case to the USAO and that there were emails exchanged and discussions that took place about developing the case "against the protester that spit on Agent McAffee." However, Plaintiff does not assert that Haro's spitting was protected speech under the First Amendment.

usual case where all federal claims are dismissed before trial, the balance of the factors "will point toward declining to exercise jurisdiction over the remaining state-law claims." Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1296 (11th Cir. 2018); see also Estate of Owens v. GEO Grp., Inc., 660 F. App'x 763, 775 (11th Cir. 2016) ("This Court has repeatedly said that, when all of the federal claims have been dismissed pretrial, Supreme Court case law 'strongly encourages or even requires dismissal of the state claims.'")

In considering the first three factors (convenience, fairness and judicial economy), declining to exercise jurisdiction at this stage would not impose substantial inconvenience or unfairness to the parties. The parties will not need to expend substantial additional resources to refile the matter in Georgia state court or refile the summary judgment motion as to the defamation claim only. All of the parties reside in Georgia, thus any inconvenience in litigating the case in Georgia state court would be virtually non-existent. As to the comity factor, the Court notes that "[r]esolution of Plaintiffs' state law claims depends on determinations of state law. State court, not federal courts, should be the final arbiters of state law." Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997). This principle—that Georgia state law claims are best resolved by Georgia courts—"is especially true . . . where the Court is dismissing Plaintiffs' federal law

15

claim prior to trial." Id.  Comity thus "decidedly weighs in favor of dismissal." Estate of Owens, 660 F. App'x at 775.

After consideration of the factors, the Court declines to exercise supplemental jurisdiction over the remaining claim.  Plaintiff's defamation claim is thus **DISMISSED WITHOUT PREJUDICE**.[3]

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. 57] is **GRANTED IN PART**.  Summary judgment is **GRANTED** in favor of Defendants with respect to Plaintiff's First Amendment Retaliation claim against Defendants Bryant and the City of Atlanta (Count One).  Plaintiff's defamation claim against Defendant Bryant (Count Two) is **DISMISSED WITHOUT PREJUDICE**.  The Clerk is **DIRECTED** to close the case.

**SO ORDERED** this 29th day of August, 2024.

J. P. BOULEE
United States District Judge

---

[3] "When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court." Ingram v. Sch. Bd. of Mia.-Dade Cnty., 167 F. App'x 107, 109 (11th Cir. 2006).